## No. 7680.

STATE OF LOUISIANA VS. G. R. FINLAY & CO., IN LIQUIDATION, ET AL.

The Charity Hospital of New Orleans, originally founded by the private bounty of Don Andrés Almonaster y Roxas, became, by Acts of the Legislature since the year 1811, a State Institution.

As such, it is owned by the State, and, whether or not the title to the property from which it derives revenues for the charitable purposes of its creation, is literally in the State, that property is, at all events, held in trust by the State for the use of those intended to be benefited by the Institution.

Under the laws organizing said Charity Hospital of New-Orleans, its property is not liable to seizure and sale under execution.

APPEAL from the Fifth District Court, parish of Orleans. *Rogers, J.*

The Attorney General for the State, Plaintiff and Appellee.

*Max Dinkelspeil* for the Charity Hospital, on the same side.

*Saml. P. Blanc* and *H. G. Morgan* for Defendants and Appellants.

First—That the property acquired by a public or *quasi* public corporation, by donation or other absolute title does not belong to the State which created the corporation. Therefore, that the cotton press and yard acquired by the Charity Hospital from the heirs of Stephen Henderson, and by partition with several institutions, never was and is not now the property of the State of Louisiana.

Second—That where the charter of an institution fully empowers and authorizes the administrators thereof " to enter into *any kind* of contract (sales of real estate excepted)," the administrators are powerless to execute contracts of sale of the real estate; that this incapacity applies exclusively to those officers, and prevents them from making a voluntary or extrajudicial sale of any of the realty. But that nothing in the language quoted or the effects stated inhibits the seizure and sale of such property to pay a judgment in favor of a creditor for a lawful debt of the corporation. Therefore, that nothing in the language of Sec. 389 R. S., or the charter of the Charity Hospital, prevents the seizure and sale of its real property to satisfy the judgment of Finlay & Co.

Third—That the language above quoted, as it authorizes the administrators of the corporation to enter into any kind of contract, except only contracts of sale of the real estate, the inhibition is restricted to the latter kind of contract only, not to other contracts as of loan or mortgage.

Fourth—That, where the power exists to contract debt or to mortgage property, the right of the creditor to sue thereon and seize and sell the property of the debtor to satisfy his debt, is necessarily implied and given.

Fifth—That where the charter of a corporation authorizes its administrators to "sue and to implead and be "*impleaded* in *all its affairs and actions*," the right of the creditor to have the judgment rendered in his favor, executed in the usual mode, by seizure and sale of property of the debtor or distringas, is necessarily implied and exists.

Sixth—That if it be admitted that the real property of the Charity Hospital cannot be sold under execution, because of an inhibition against sales of real estate, and the charter of the corporation fully authorizes and empowers the administrators to rent and lease its property, then may a creditor execute and satisfy his judgment for debts by causing said property to be rented and leased for that purpose, or he may seize and sell the right of occupation of the property for such time as may be necessary to realize the amount of his judgment.

Seventh—That where the right of occupation has been separated from the naked right of disposal, or is possessed by one who controls the former without having the latter, the right of occupation is susceptible to execution for debt. ·

Eighth—That a court having rendered a final judgment against the Administrators of the Charity Hospital, condemning them to pay the debt of Finlay & Co., must enforce and execute it by writ of distringas or other writ, upon and against such rights and property under the control of said administrators susceptible to be applied or used to provide a revenue.

The opinion of the Court was delivered by

TODD, J.  G. R. Finlay & Co., the defendants herein, obtained in May, 1878, in the Fifth District Court of the parish of Orleans, a judgment against the Board of Administrators of the Charity Hospital, for $11,299 65.

On this judgment they caused a writ of *fieri facias* to issue, under which certain real estate, described in the petition, was seized and advertised for sale to pay the debt.

The State of Louisiana, through the Attorney General, obtained a writ of injunction prohibiting the sale of the property seized, and asked for a decree declaring the property in question exempt from seizure and sale under execution. And it is the question of the exemption thus claimed for this property that is presented for our solution, and it is the only question involved in the case.

In 1838, Stephen Henderson, by last will, bequeathed to the Charity Hospital an annuity of four thousand dollars. Certain heirs of the testator instituted suit to have the will declared null. After some litigation the suit was compromised, and by an act of partition passed on the 3d of April, 1841, in pursuance of the compromise, the Charity Hospital became possessed of the property seized in lieu of the annuity devised by the will.

The Charity Hospital was founded in 1784 by Don Andrès Almonaster y Roxas. It remained under the patronage and direction of the founder till 1811, when it was formally ceded to the public. By the act of the Legislature accepting the cession, it was placed under the direction of a council of administrators, nine in number, of whom the Governor was to appoint six and the City Council three.

By an act passed in 1813, it was enacted that all the members of the board of administrators should be appointed by the Governor, and that the Governor himself should be a member and president of the board. Since that time the institution has been under the control and management of this board, the members of which are annually appointed by the Governor, by and with the consent of the Senate.

To provide for the support and maintenance of the institution, the Legislature has from time to time made appropriations of money from the State treasury, and has in various ways sought to increase its revenues by requiring certain fines, forfeitures and penalties to be paid directly to the hospital; by imposing taxes on theatres, circuses, balls, concerts, etc., for its benefit; by authorizing the board of administrators to accept legacies and donations made to it, and by other methods creating or increasing its sources of revenue.

We find, also, a statute prohibiting the contracting of any debts beyond the revenues of the institution and the annual appropriations made by the Legislature, and another containing an indirect but plain prohibition against the sale of any real estate to which it might be entitled.

These are facts touching the history of the institution, and the policy of the State in relation to it. We have deemed the recital of them essential, in order to arrive at the true original character of the institution; for it is upon an ascertainment of its true character and exact *status* that a settlement of the issue, presented by the record, mainly depends.

Under our system the Constitution of a State embraces but the general frame-work of the government, outlining as it were only the great powers intended to be permanent, but leaving to the Legislature the task of establishing the lesser or subordinate powers, to be exercised according to the necessities of the government, and for the purpose of carrying into effect the great object for which all governments were instituted—the well-being and happiness of the governed. The Legislature may also, in its wisdom and discretion, delegate some part of its powers to inferior or local authorities the more efficiently to execute its purposes. We see instances of this in the powers delegated to municipal and other public corporations for the government and police of towns and cities, for the facilities of travel and transportation, for the establishment of universities and colleges and eleemosynary institutions, etc. It is the highest duty of every well ordered State to make suitable provision for the maintenance and well-being of certain unfortunate classes of society, such as the insane, the deaf and dumb, blind and indigent sick. And, indeed, in modern times the true measure of

the progress, enlightenment and humanity of a people or a nation is the provision made for these classes of persons.

To carry out these beneficent objects the State may found asylums, established at its own expense and under its direct control, management and supervision; or it may commit this important work, or a part of it, to public corporations, expressly created for such purposes, and to which a part of the powers pertaining to the sovereignty are delegated by law the more effectively to carry them into execution. And whether these institutions are established by the State by direct appropriations from its own treasury, and administered and controlled by direct governmental authority, like the asylums for the blind and deaf and dumb in our own State, or are under the management and administration of a public corporation, as is the Charity Hospital of New Orleans, they all stand upon the same footing, are all equally State institutions, under the care and guardianship of the State, and equally entitled to its aid and protection. And this principle is expressly recognized in the case of Featherman vs. La. State University, 2 Woods, 71. All such institutions are owned by the State, with all their appurtenances. It may not be that the title to the property, from which their revenues may, in whole or in part, be derived, is literally in the State; but, nevertheless, the State owns them or holds them, in trust though it be, for the benefit of those they were established to serve, just as it holds all its constitutional or governmental powers, in fact, as trusts to be executed for the benefit of the people.

The Charity Hospital, as we have seen above, was formally dedicated to the public by its original founder. For more than half a century it has been virtually under State control and management, through its board of administrators, appointed by the Governor, and of whom the Governor, the Chief Executive of the State, is president. It has been maintained, as we have seen, directly or indirectly by the bounty of the State; and to-day it stands as a monument of the beneficence of the State, the great instrumentality through which the noblest of charities have been dispensed and relief extended to thousands of the distressed and afflicted, not only of our own State, but of other States, who have availed themselves without return of our benevolence, and which, as a source of just pride to the citizens of the State, has survived the calamities of war, seasons of the greatest financial depression, and years of disorder and misrule.

That we may realize how completely the property, from which the revenues of the hospital are, in part, derived, belongs to the State, though in trust, as we have said, we have only to suppose that the public corporation that administers its affairs were dissolved, as it could only be by State authority, and the institution ceased to exist, to whom, then,

would this property belong? It would not revert to the original donors; it could not be held by individual members of its board of administrators; but the State, and the State alone, could lay any legal claim to it.

If, then, this hospital is a State institution, maintained and administered, as we have seen, by State authority, it is the first duty of the State to secure and preserve to it the essential conditions of its existence for the puposes for which it was established. This duty is a paramount duty that rises above all other considerations, and especially considerations that affect only interests of private individuals. It is utterly inconsistent with this duty and the protection that the State owes to this institution to suffer it, from any cause, or at the instance of creditors or other persons, to be deprived of its property, without which its work of beneficence and charity cannot be accomplished. For all practical purposes, the exercise of the right claimed by the defendants to seize and sell the property from which it derives its support, and on which its existence depends, would destroy the institution and abrogate its charter as effectually as if that charter was repealed by law. The means of support of the institution, whether derived from the bounty of the State or from legacies or donations made to it by authority of law, are, of course, indispensable to its existence, and, in fact, constitute its very life.

The Legislature recognized this principle, and sought to consecrate those means of support and debar any diversion of them, when it declared that "all moneys coming to the hospital shall be exclusively appropriated to the use of the patients," excepting only the funds that might be required for buildings and repairs.

Revised Statutes, Sec. 396.

The property seized, representing as it does the annuity already mentioned, must be enjoyed as the annuity would have been without the compromise.

Under this view of the subject, we are forced to the conclusion, that the property in question was exempt from seizure, and that the injunction against its sale must be maintained.

We do not doubt but that the claim of the defendants, the seizing creditors, is a strictly meritorious one. Nor have we reason to question the statement of their counsel, that the defendants came to the rescue of the institution in the time of its sorest need by advances of supplies necessary for its maintenance, for which they have never been paid; and it is not without deep reflection that we have come to the conclusion expressed. There is something repugnant to the moral sense that a corporation can contract a debt and that its property should not be subject to legal process for its payment. But this consideration must

yield to the sternest legal necessity. To grant the relief in the manner sought is beyond the power of the judiciary.

The judgment of the lower court, which was in favor of the plaintiff, perpetuating the injunction, is affirmed with costs.

## ON RULE TO DISMISS APPLICATION FOR REHEARING.

POCHÉ, J. Defendants having filed an application for a rehearing from the decree rendered in this cause, on November 29th, 1880, and having also applied for an extension of time for the filing of briefs in support of their application, plaintiff moves that the order granting the delay prayed for be rescinded, and that defendants' petition for rehearing be dismissed on the ground of the following agreement, which was made, and was entered on the minutes of this Court on the 21st of May, 1880, in reference to this case:

" It is agreed by counsel for both parties in open Court, that the delays within which to apply for a rehearing are waived, and that the judgment to be rendered by this Court shall become final and executory immediately on its rendition."

Defendant, G. R. Finlay, and his two attorneys, have filed affidavits in which they urge in substance, that their understanding of the above agreement was that the case was to have been decided at the term of the Court which expired on the 31st of May last, 1880, and that the agreement was entered into by them for the sole purpose of securing or facilitating a final decision of the case at that term of the Court.

We have no reason to doubt the good faith and the truth of the statement made by affiants, but we are called on to interpret and enforce an agreement which is of record in our minutes, which is clear and unambiguous, and glaringly exclusive of, and inconsistent with, the interpretation invoked by defendants. The agreement is sweeping, definite and complete, and suggests no restriction, exception or qualification, and must be construed as law unto the parties thereto.

As defendants intended their waiver to have effect only on a decision to be rendered at that term of the Court, they should have inserted some provision justifying such a restriction, in default of which their opponent be secured in the rights which he thus acquired, as sacredly as defendants would have been maintained in the corresponding right in the event of a decision favorable to them.

It is, therefore, ordered, adjudged and decreed that our order of December 13th, 1880, allowing delay for filing briefs in support of defendants' application for a rehearing be rescinded; and that their application for a rehearing in this case be dismissed, and that they be condemned to pay the costs of this proceeding.

Levy, J., absent.